HARRIS *v.* LOUISVILLE, N. O. & T. R. Co.

*(Circuit Court, W. D. Tennessee.* March 31, 1888.)

1. ARREST—WITHOUT WARRANT—FUGITIVE FROM JUSTICE.
   A private detective, in pursuit of a fugitive from justice from another state, cannot arrest without a warrant by merely procuring a policeman to make the arrest. Policemen may sometimes proceed temporarily without a warrant, but the circumstances and exigencies of the particular case must justify such departure from the lawful and regular methods of procedure.

2. RELEASE AND DISCHARGE—DURESS.
   One arrested illegally cannot be bound by any release of damages procured while he was under arrest or the continuing influence of his captors, unless the circumstances show that it was fairly and voluntarily obtained, and the facts of this case do not answer that rule.

3. MASTER AND SERVANT—MASTER'S LIABILITY FOR SERVANT'S TORTS.
   The master is liable if the agent, while engaged in his master's service of pursuing a criminal, arrest illegally another man, supposing him to be the fugitive, although acting in disobedience of orders in further pursuit.[1]

4. TRIAL—INSTRUCTIONS—DIRECTING VERDICT.
   The court should never usurp the function of the jury by directing a verdict when there is a dispute about the facts; but this dispute must arise on the proof, and grow out of conflicting testimony, fair question as to the credibility of witnesses, variety or diversity of inferences and implications of fact

---

[1] A master is responsible for the wrongful act of his servant within the general scope of his authority, although he did not authorize the particular act, Heenrich v. Car Co., 20 Fed. Rep. 100; Railroad Co. v. Conway, (Colo.) 5 Pac. Rep. 142; Railroad Co. v. Rice, (Kan.) 16 Pac. Rep. 817; or if it was against his express orders, Railway Co. v. Kirk, (Ind.) 1 N. E. Rep. 849, and note; or in disregard of them, Cleveland v. Newsom, (Mich.) 7 N. W. Rep. 222; Driscoll v. Carlin, (N. J.) 11 Atl. Rep. 482. He is liable for the trespass of his servant, Walker v. Johnson, (Minn.) 9 N. W. Rep. 632; State v. Smith, (Me.) 4 Atl. Rep. 412; but not for his willful trespass, Wood v. Railway Co., (Mich.) 18 N. W. Rep. 124; Curtis v. Dinneen, (Dak.) 30 N. W. Rep. 153; nor for his wanton and malicious acts, Railroad Co. v. Brannen, (Pa.) 2 Atl. Rep. 429; unless he authorized or subsequently ratifies them, Railroad Co. v. Moore, (Tex.) 6 S. W. Rep. 631. A common carrier is liable in damages for a wanton and malicious assault by one of its servants on a passenger. Williams v. Pullman's Car Co., (La.) 4 South. Rep. 85; Railway Co. v. Savage, (Ind.) 9 N. E. Rep. 85; Murphy v. Railroad Co., 23 Fed. Rep. 637; Railroad Co. v. Wood, (Ind.) 14 N. E. Rep. 572. As to what acts of a servant are within the scope of his authority, so as to render his master liable for injuries resulting therefrom, see Com. v. Briant, (Mass.) 8 N. E. Rep. 339, and note; Pike v. Brittan, (Cal.) 11 Pac. Rep. 890, and note; what are not, see Olive v. Marble Co., (N. Y.) 8 N. E. Rep. 552, and note. As to the criminal liability of the master for the illegal act of the servant, see Com. v. Briant, (Mass.) 8 N. E. Rep. 339, and note; Com. v. Stevenson, Id. 341.

from the circumstances proved, or the like; and the mere denial of inferences to be plainly drawn from established facts, either by pleading, testifying, or in argument, cannot raise a dispute of facts to go to the jury. If, fairly looking at the testimony, there can be no reasonable dispute about the facts, the court should direct a verdict where it would not at all sustain one to the contrary, if rendered by the jury.

5  DAMAGES—EXCESSIVE—FALSE IMPRISONMENT.

Where the defendant employed a private detective to pursue an embezzler of its funds into another state, and that detective bunglingly pursued a stranger for the fugitive, arrested him wholly without a warrant or other magisterial sanction, induced him to go with him without extradition procedure, and in irons carried him to the detective agency headquarters, where he was induced to sign a release of the agency and the defendant railroad company, under circumstances rendering it void for duress, the court would not interfere with a verdict of $5,000 as excessive, although pronounced more than the judge thought he would have given if on the jury. All mankind must at first blush think the verdict excessive to justify such interference.

At Law.  On motion for a new trial.

The plaintiff Harris left his home in North Carolina in 1885 to visit the exposition at New Orleans, and with the further object of bettering his financial condition. He carried with him letters of recommendation from a number of people of good position in his native state. After trying the lower Mississippi valley for a twelve-month or more without success, he took deck passage on the steamer Arkansas City for St. Louis, in July, 1886. Among the other passengers on board also bound for St. Louis was a man named McCall, who had been depot agent for the Louisville, New Orleans & Texas Railroad Company, at Hampton, Miss., and who had embezzled $700 of the company's money. He was *en route* north to escape arrest. Manager Edwards notified Thiel & Co., who sent D. D. Anthony, a detective, who had some time before been detailed for the railroad company's service by Thiel's detective agency, at St. Louis, and instructed him to arrest McCall on the arrival of the boat at St. Louis. The detective got on Harris' trail, and followed him to Chicago, whither the young man went immediately after his arrival at St. Louis. At Chicago he called upon Supt. Sage, of the Lake Shore & Michigan Southern Railroad, and applied for work as a brakeman. He was told to return next morning at 7 o'clock for an answer. At the appointed hour the young man appeared at the superintendent's office, and a few minutes afterwards he was arrested there by Anthony and Detective Slayton, of the Chicago police force, without any warrant or papers of any kind. He protested that he had done nothing wrong, showed his letters of introduction, and demanded to know the cause of his arrest. The detectives took the letters, and kept them, but in answer to their prisoner's question, only said they "wanted" him. Harris was taken before Chief of Police Burke, who told him that he was wanted for stealing money from the Louisville, New Orleans & Texas Railroad Company. Harris again protested his innocence, and asked leave to communicate with people who knew him, and could prove that he was not guilty of any such offense, but to no avail. His captors locked him up in a cell in the jail, and that night, or next morning, he was handcuffed, put on a train, and taken back to St. Louis. As soon as possible he

was conveyed to the office of Thiel's detective agency, and there the discovery was made that not only was Harris the wrong man, but also that he did not in the least resemble the right one; being three or four inches taller, and of totally different hair, eyes, and complexion, and having a broken nose. Harris was given a dollar, and told that he was free to go where he chose until 10 o'clock next day, when he was to report at the office. · He was there on time, and found several of "the force" waiting for him. They took him into a private room, and induced him to sign· an agreement to hold the detective agency and the railroad company blameless of the wrong to which he had been subjected. Harris swore at the trial that he did not read the paper, and that he signed it in order to escape from the clutches of his persecutors. They finally furnished him with a ticket to Memphis, and a couple of dollars in cash, and let him go. On arrival at Memphis, according to Harris' statement, he. called on Manager Edwards, and claimed some compensation for the treat-- ment he had undergone. The manager reminded him of the agreement signed at St. Louis, and refused to give him any money, but offered to give him passage to North Carolina. On first regaining his liberty Har- ris had determined to return to his old home, but subsequently decided to go to Oxford, Miss., where he has relatives, and Manager Edwards furnished him transportation to that place. He brought this suit against the railroad company for damages.

*Chalmers & Cooper*, and *Gantt & Patterson*, for plaintiff.

*Holmes Cummins*, for defendant.

HAMMOND, J., (*charging jury.*) It is not the least doubtful on the· facts of this case that an enormous outrage has been committed against the plaintiff's right of personal liberty. That which distinguishes our· Anglo-Saxon civilization most of all is its absolute guaranty to every citizen against arbitrary arrest. The only faith which he can have in that. guaranty comes from his reliance on the ministers of the law to enforce it. His only remedy, short of that individual redress by combat which the· law denies him, is the verdict of a jury against the wrong-doer, and that verdict you cannot withhold, if we have the wrong-doer here: No language of mine can adequately express the just indignation which every English-speaking judge and juror must feel at the recital of such methods as the detective Anthony confesses to have taken about this arrest, even if they had been taken against McCall, the real culprit, whom he was seeking. His audacious expression upon the witness stand of his con-- viction that "cold iron"—as he called the manacles with which he bound the plaintiff—was the best reliance for producing that "friendliness" of disposition of his victim, of which he boasted as a result of his skill in· this case, shows that he is as cruel in his instincts as he is bungling in his work. That he is incompetent and incapable of appreciating the legal rights of those whom he may be called upon to arrest in the course of his employment, and that he is thoroughly reckless of the limitations· imposed by law upon one engaged in making arrests, is demonstrated by the facts of this case. Detective bureaus, detective agencies, and detect--

ive agents are useful instrumentalities in the pursuit of criminals, and every citizen may resort to them as occasion may require for that purpose. They deserve and receive at the hands of intelligent courts encouragement in that work, and protection, as far as need be, from the natural human predjudice against their craft. But this treatment presupposes intelligence, humane considerations of common fairness of conduct towards accused persons, and, above all, scrupulous care for legal rights as against arbitrary arrest. The wickedness of any other conduct on their part is always rebuked by courts and juries. Arbitrariness of method is not challenged as often as it should be, but, whenever it is, the courts apply the remedy, unless they are themselves recklessly arbitrary and disregardful of the traditional and constitutional rights of men, born into the privileges of our race of freemen.

Now, how was it here? A freeman was arrested, without complaint according to law, without the warrant of law, or any sort of pretense of legal procedure; was detained without authority of any magistracy; was locked up in a cell, without any commitment or other process, or any pretense of any; and was hurried away to another state, without legal arrest for that purpose, or any purpose, in irons, to find at the end that he was not the man wanted; that there was no accusation against him, legally preferred or otherwise; and that, so far as this proof shows, the only justification for the arrest was that he had traveled on the same steam-boat upon which the real culprit was supposed to have traveled. The stupid detective had not the excuse of the slightest resemblance of the two men to each other. But, if he had taken the right man, his proceeding was none the less outrageous, and was so arbitrary and illegal that the fact of his being in pursuit of a felon should hardly mitigate the wrong done to the rights of freemen by a willful disregard of the privilege of exemption from all arrest, except by due process of law, which means an accusation made before a proper tribunal, and a written warrant authorizing the arrest, unless it may be that, under circumstances not pretended here, there may be a temporary detention until a magistrate may be reached. In such cases it is the duty of the arresting party to carry his prisoner immediately before a magistrate of lawful competency for that purpose, to accuse him there according to the forms of law, and obtain the necessary magisterial sanction for any further detention. This temporary proceeding, without previous warrant, can only be resorted to where there is an urgent necessity for proceeding without the delay of procuring the warrant beforehand, and the detention can only last long enough to bring the prisoner before the magistrate for a proper inquiry. There was not the least excuse here for any departure from the regular method of proceeding. If the plaintiff, or the real culprit who was wanted, had been "located," as this detective thought and reported him to be, nothing was easier than to have gone before the magistrate, made the accusation on oath, and, having procured the warrant, proceeded to the arrest. This not being done, the arrest was unlawful. So if, being otherwise arrested, he was not immediately taken before a magistrate and accused, that was unlawful. The arresting officer cannot lock up and de-

tain the prisoner to suit his convenience for further inquiry; nor by the prisoner's consent can this be done. He must be taken before a magistrate for his protection there, and only by the sanction of that magistrate can he be detained, either with or without his consent. He is in no condition to consent freely, or to bind himself by a waiver of his rights, except under the protection of the magistrate. He is entitled to that protection, and without it his detention cannot be lawful, if ever he chooses to challenge the legality of the arrest. His consent may mitigate the damages, reduce them to a nominal amount, if he be intelligent and has knowledge of his rights in the premises, but never can it in the least justify the arrest, or make it lawful. Kings and regents, presidents and governors, parliaments and legislatures, are bound by this "law of the land," and cannot change it if they would. Is it not, then, absurd for a "detective" on the witness stand to say, as Anthony did, that unless "the service," as he and Newcome, his "manager," call it, has this power, criminals cannot be apprehended?

But it is argued that policemen can arrest without warrant, and that the Chicago policeman—another "detective" he was, however—was "licensed" to do this thing. That is a mistake. Policemen do not possess the power of arbitrary arrest more than other officials do. No man possesses it, or can possess it, under our laws. Policemen may arrest temporarily and carry before the magistrate, as others may, and, owing to the necessity for it, they may proceed without warrant under circumstances which would not justify others in doing so. Temporary arrest without warrant previously obtained is an extraordinary procedure, which the facts must justify in any one attempting it. Policemen justify it by the circumstances surrounding their employment, and the necessity for immediate action. But when the circumstances are such, as in this case, that no such necessity exists for immediate action, the arrest without previous warrant cannot be made by a policeman any more than by others. Here was a supposed fugitive from another state pursued into Illinois. He was to be arrested for a crime long since committed in that other state. He had been "located," according to the detective's testimony. The state of Illinois prescribed a special procedure for that kind of arrest, and none was lawful without it. The common "law of the land" prescribes a general and ordinary method in all cases, and that was not pursued. There was no necessity for a temporary arrest without warrant. A trap was laid to arrest a man who could have been arrested upon a warrant without difficulty. All the facts and circumstances necessary for a previously procured warrant were known, and detention for inquiry was unnecessary, once the arrest of this particular man had been determined upon. It is true that, being arrested without a warrant, a subsequent legal procedure, by carrying him before a magistrate, would have saved this outrage by developing the fact that the wrong man was arrested, and would likewise have saved this lawsuit. But Anthony, with characteristic self-assurance and reckless self-reliance, assumed the function of determining that fact for himself. He did not, in his conceit, doubt but that he had the right man, and he had no need of mag-

isterial inquiry, and, having his helpless and friendless prisoner in his power, what did he care for, or what did he know, for that matter, of his prisoner's legal right to be carried before a magistrate? So far as this proof shows, nothing. Having him in his power, he proceeded to procure his consent to go along peaceably, at his will. It is not the case of a lawful procedure to arrest one man and by an unfortunate mistake arresting another, nor of the temporary arrest of a suspected offender by a policeman desiring to make further inquiry. Not at all. It was an unlawful procedure against all men and against the rights of freemen, as we know them under our law. The inestimable value of legal procedure is illustrated by the facts of this case. Imperfect protection it may often be, as all human institutions are defective; but here it would have saved this man from arrest, and have been a complete protection to him. Departure from it caused this wrong, as it always wrongs some one. It is not because a mistake was made in the progress of legal proceedings, but because the proceedings were wholly illegal, that they deserve our severe condemnation.

Now, gentlemen of the jury, is the defendant responsible for this trespass upon the right of a freeman to be always free, not only from wrongful arrest, but from wrongful accusation and wrongful punishment of the kind inflicted on this plaintiff "without due process of law?" I use this language in the sense that belongs to it by the traditions of our race, and that has been stamped upon it by our law. For it is my opinion that in the exaggerated attention we pay to mere political freedom—the mere right to conduct the government—we are losing the sense of regard for personal immunity from interference by arbitrary power, such as has been exercised against the plaintiff, and, if not in this repulsive form, in a less degree often used against others who submit without more than a temporary protest. That the defendant is responsible to the plaintiff in the facts of this case there can be no doubt. We all know that the defendant did not, and none of us believe that its officials would, under any circumstances, authorize or sanction a proceeding like that which was taken against the plaintiff. Nevertheless, it employed Anthony as its agent, and is responsible for his incompetency and negligence in the line of that duty he was sent to perform in this case. The defendant has proved much, very much, that should go in mitigation of damages, but not one thing by way of substantial defense. The pretense that Anthony was not its agent scarcely deserves any notice; but if he were not, Thiel & Co. were its agents and Anthony theirs, and, being theirs, was that of the defendant likewise. Moreover, Anthony was in its direct employment in the sense that he was detailed to do its work, and sent to do this, as part of it. The order for desisting from the pursuit of McCall was given to avoid paying a reward, and was not absolute, in the end of the correspondence. But if it were, the defendant was still liable for sending an agent who negligently disobeyed its orders, and proceeded, notwithstanding the revocation of instructions, to execute them negligently. The release was absolutely void, and, under the circumstances, rather an aggravation of the damages than otherwise. The outrage of

taking it from the plaintiff was but little less than the original wrong in enormity. There was no adequate consideration for it. The reliance upon the technical and nominal consideration of one dollar was of a piece with the other pretenses that a policeman was the wrong-doer, that Thiel & Co. were the principal employers, that the "friendliness" of the transaction and "consent" of the plaintiff were a justification. The doling out of a dollar or two to pay for scant food and lodging and tickets to other places was no consideration for the release that was adequate, under the circumstances, and all show the fraud of its procurement by duress.

I do not leave these questions to you, because no verdict would be rendered by you upon them for the defendant, and if a less intelligent jury should find such a verdict, on the facts of this case, it would be set aside by the court as unsupported, wholly, by any proof. Therefore, I direct a verdict for the plaintiff, on the undisputed facts of this case, and instruct you that the only question for you to decide is the amount of damages to be awarded by your verdict. But as to that the whole case is with you. Every fact and every circumstance is important to your consideration. If we had Anthony here I should say to you that it was a case for the severest application of the rule of punitive damages, and scarcely any verdict could be excessive,—not, at least, within his ability to pay, however large that might be. But he is not here. You must not allow the denunciation of his wrong, made from the bench, to influence you to the punishment of this defendant. It was not made for that purpose, but to show how uttlerly hopeless any defense made to this action must be, on the law of this case. The defendant did not authorize Anthony to proceed wrongfully, even as against McCall, nor against this plaintiff at all. There is no proof that it even knew of Anthony ever proceeding illegally in arrests, or that it was aware of his stupidity and incompetency in the matter of legal procedure to procure arrests, nor of his negligence in the matter of finding the right man. He was the agent of a regular bureau of detectives, and the defendant no doubt relied on their employing competent men for the work; and so there is not the least evidence of negligence in employing him for the work. The defendant did not contrive the release or procure it, or otherwise wrong the plaintiff directly, and is only liable because one of its agents has done its lawful work in an unlawful manner, whereby the principal becomes liable, in law. It is not a case, therefore, for "smart money," as the lawyers call it. But the plaintiff, there being no legal justification for his arrest, has a right at your hands to compensation in damages for the wrong done to him. The law has no delicate scales with which to measure it to him by exact rule as to amount. That all depends upon your sense of justice and fairness in view of the extent of his injury. You may and should consider the direct expenses incurred by the plaintiff, his loss of time, his bodily suffering, his mental agony, his loss of reputation, the degree of indignity involved in the wrong done and the consequent public disgrace attending the injury. These and any similar elements of injury shown by the proof should be taken by you as the basis of the compensation, and such compensation cannot be diminished

by any reason of good motives on the part of the wrong-doer. To whatever you shall determine as fair compensation he is entitled, notwithstanding any mitigating circumstances such as good motives, honest mistakes, etc. Having told you that the evidence does not justify any vindictive damages or authorize you to assess the defendant beyond a fair compensation, it has had, in that instruction, the fullest benefit of all the mitigating circumstances, and your only inquiry need be, what is a reasonable compensation, in view of all and every circumstance connected with the transaction, for the wrong done to the plaintiff. For that the defendant is liable, notwithstanding its own innocence of any direct participation in the wrong. In deciding the amount of damages, you will act as reasonable and impartial men, intelligent in the adjustment of the compensation to the injury, so as not to wrong either party by undue passion or prejudice for or against him, and above all, with strict regard to your own sense of justice in the premises.

### ON MOTION FOR NEW TRIAL.

HAMMOND, J. However it may have arisen, it is the settled practice in Tennessee, from time immemorial, so to speak, to follow the entry of a verdict with the immediate entry of the judgment of the court upon it, and in the same form as in this case was done. We cannot, therefore, however much we might desire to put our record in a shape to allow a writ of error, resort to a practice in vogue in some of the states, perhaps, of entering only the verdict pending a motion for new trial, and thus, where the verdict is for exactly $5,000, as here, by an accumulation of interest carry the amount beyond the minimum prescribed as limitation to the jurisdiction of the appellate court. We need not then trouble ourselves with any inquiry whether this is the proper practice in entering judgments, and whether, if it be not, verdicts can bear interest, for, being an established local law, we are bound to it by the practice conformity act, and cannot change it.

The objection made to the charge is that the question as to the validity of the release should have been submitted to the jury. It is best answered by a careful review of the testimony on that point. The defense against it was duress, which, whatever else may be said about it, is only an inquiry into the plaintiff's state of mind when he signed the release. Now that a party is a competent witness, he may of course be asked as to the state of mind which is the subject of inquiry, and if he be a credible witness, whose testimony is believed, his statement on the subject would be conclusive, particularly if the facts and circumstances corroborate his statement by being of that character which would, in our experience, produce that state of mind. Nevertheless, I should never have thought of directing a verdict on that issue upon the plaintiff's own testimony, however credible I should take it to be, for the reason that his credibility would be solely for the jury to determine, as the learned counsel has argued. The fact that he is a party in interest so discredits his testimony that at common law he would not be heard at all; and, while the statute confers the privilege of competency upon him, it does confer

credibility upon him; but, as with other witnesses, that is a question for the jury weighing his evidence by the light of the fact of his interest along with the other lights turned upon it. But this is true, not only of the witnesses who are parties, but of all others; and, if the fact that the jury must alone judge of their credibility is to deter the court from directing a verdict, there would never be any such direction in any case, as in Tennessee there rarely, if ever, is, for that very reason. Such, however, is not our practice here. Yet, because of the consideration already stated, where the party's own testimony is his only reliance, I think I should not direct a verdict, but leave it to the jury to say how far his interest has discredited him. I do not say that such a direction should never be given, but only that it is the best way not to take that course, in my opinion. In this case I hesitated about the proper course to take, but finally concluded that, discarding the plaintiff's testimony wholly, I should not, on the proof as then standing, approve any verdict establishing that release. I am almost tempted to quote *verbatim* the stenographer's report of the testimony on this subject, but it is too voluminous and burdensome for that purpose, and we must be contented with the salient features otherwise stated. The detectives who procured the release are very confident in their opinions that it was freely given, that the plaintiff was not "embarrassed" or "frightened" when he signed it; and they testify as to his "pleasing" appearance and "jesting" manner of treating the situation. Their opinion that he acted voluntarily is, of course, of no weight; and, while his manner is a circumstance to be considered, it is also not very conclusive, for that itself may have been the product of coercion in the sense that it was assumed as a matter of policy or was the effect of a light-hearted inappreciation, usual in youth, of the gravity of the situation. That feeling is altogether beside the question of duress in the matter of signing the contract. The great fact was that there were his captors, and that he was substantially in captivity, or under the dominating influence of it, like a ward just come of age, and technically free, no doubt, but still under the influence of his guardianship when he signs a contract one-sided in its advantages, and of no value to him; or like a client under similar circumstances releasing his attorney, only that in the nature of it the captor stands in a relation of more intense influence over his victim. It is more nearly like a release signed by a wayfarer who is robbed by the highwayman, and who, with ceremonious and punctilious courtesy and all due regard to the forms of contract, is politely requested to sign a release. I do not mean to say that these detectives deserve the odium attaching to the highwayman, but only that that situation more nearly corresponds to that than the two just mentioned; and yet, the mere fact that the relation is technically dissolved does not suffice. They say that the plaintiff had been released. Yes; but how? When it was seen that the wrong man had been arrested, he was not thrust again into prison, as at Chicago; and Newcombe, the manager of the detective agency, says that he probably told him, "You are not the man I want." Giese, the book-keeper, says that he was not under watch or guard, and "went in and out of the office, just as any

one else would." Anthony, who brought him in irons from Chicago, says that when the prisoner had been told to stand up, and the measurements had been made, and the description of McCall compared, "it was generally agreed upon by all of us that a mistake had been made; that Mr. Harris was not the man we wanted. I don't remember that any one said that in that many words." Again: "*Question.* When was it that you told him that he was not the man, or did you ever tell him that? *Answer.* I think that Mr. Newcombe possibly told him that he was the wrong man, but it was universally agreed among us immediately on my arrival in the office that a mistake had been made." Further on the question is asked him: "And you had never told him he was discharged, had you? *Answer.* Well, I don't know; it had been said right before him that he was not the man we wanted. *Question.* But did you tell him that he was discharged? *A.* I didn't know that he was; but he was told within ten or fifteen minutes after he got into the office that he was not the man we wanted."

Again, it is plain that this young man was never released in the open, unmistakable manner that should have been pursued, whatever other construction may be put upon the facts. When he left the office Anthony went with him, and when he came back Anthony came with him. Meantime they had gone to examine his trunk left in St. Louis, or to find it, and finding it, there was an examination of its contents by Anthony. Next he was given a dollar or two to pay expenses of his lodging and board, but with an "agreement" or "understanding" or "order" to return next morning, which he did promptly, as required by the arrangement, whatever it was. Then he was shown into a back room, where he remained until the release was signed, which had been in the mean time prepared by a lawyer, without any consultation or agreement with plaintiff that he would give such a release, or any request of him to sign one, or any negotiation such as usually precedes the entering into any contract, verbal or written, where the parties act freely. Whatever else he did, there is no pretense that the plaintiff came back to that office to negotiate for, or enter into any contract with, his captors. Why should he come back at all if he were a free man? Why was he not given the liberty to go at will whither he wished? If money was to be, in justice, given to him to pay his way home or back to Chicago, either as compensation for the wrong done or in consideration of the release, why was it not given to him and he dismissed to regulate and control his own movements? An absolutely free man would have been thus treated, and he would have been placed upon an equality of freedom before making a contract with him for release. The law requires that this should have been done, even in those fiduciary relations already mentioned as analogies upon this subject of duress. Recognizing the necessity of this, the testimony of these witnesses proceeds on the theory that he was free to go at will and do as he pleased, and from beginning to end the whole proof is the suggestion of an apology for or an explanation of the facts, so as to conform to that necessary theory in order to support the release. Thus, without any formal discharge, it is assumed that he knew he was

free when it was determined, in his presence, that he was the wrong man; Anthony went with him to examine his trunk, in which was found, so much to Anthony's delight, "the little hat he had worn on the steamboat," as described to Anthony by people traveling with the plaintiff; he went with him "as a friendly guide over the city in which he was a stranger;" and he went back with him to the office of the detective agency "because the plaintiff wanted to go back to arrange about the transportation to Memphis," whither he had chosen to go with Anthony. But why with Anthony? And why to Memphis? The explanation is that he did not want to go to Chicago, being tired of that town, and had been offered the choice of going back to Chicago or to his home in the south. But his home was in North Carolina, and why was he not given money to go there? The explanation offered is that Anthony was going to Vicksburg, by way of Memphis, and that the plaintiff "agreed" to go that way with Anthony, who was to "take" him there, —to use Anthony's language. So tickets were bought, and he "agreed" to meet Anthony, who had the tickets, at the depot, and he did meet him there, but somehow the train got off, bearing Anthony and the tickets, and leaving the plaintiff behind; and on "reporting" again at the office he was furnished another ticket and allowed to go alone, as he might have been at first allowed to do, if entirely free, and these captors had done with him as they say. The truth is he was not free, at least not in the sense of the law of duress. The explanations given to give color to this alleged freedom are disingenuous, and proceed upon the notion that because he was not "shadowed" or under watch and guard he was free. He had learned to obey, to "agree," and "consent" to almost anything. He had "agreed" to come along without further trouble from Chicago; he had "agreed," and "on his honor," not to escape, if the handcuffs were not put upon him while being marched through the streets of St. Louis, without warrant or other authority than "a police arrest" in Chicago, in another state; and the only sensible thing done in this whole wretched business was the refusal of the St. Louis prison keeper to recognize this novel "police arrest" as a warrant to imprison him there. Notwithstanding the repeated avowals in this proof by these witnesses that they had all agreed that this was the wrong man, and the fact of the release, there is a strong suspicion in my mind that, being human, Anthony still thought that possibly he had made no mistake, and he was anxious to bring his man to Memphis to his employers there, to be certain of it, and, while none was willing to take the responsibility of keeping up the actual arrest, all were willing to so conduct the business that, in effect, plaintiff should be brought to Memphis, where he had no more business than he had in St. Louis, for which place they had originally started. It may be that the motive of tolling him there was that the question of money to pay his way to North Carolina might be settled at the railroad headquarters; but in either case, under this law of duress that requires a complete release from the domination of all influence connected with the captivity or that the influence will be presumed to continue, there is no room for argument even, on the facts, that the plaintiff

was not still under duress.     Detectives are given to that kind of double dealing above described, and their testimony must be weighed in view of that fact.

Coming, then, to the signing of the release in the office of the "service"—as they call it—with this young man away from home, in a strange city, without friends or counsel, and his captors not taking any pains to help him to any advice except their own, not even the lawyer drawing the release for the captors being present to advise him, presented with a previously prepared paper about the terms of which he was never consulted, about which "contract" there had never been one word of negotiation of any kind, for which there was not one cent of consideration paid, and only the miserable pretense of a nominal and technical consideration of one dollar, and signed there among his captors at their request, —under these circumstances, is it not useless, I say, to speak of submitting such facts to a jury on proof of the opinion of the captors that he was not "frightened;" that he was "free," because he knew that he was the wrong man; that it was read over to him; that he made no objection, and such like circumstances?     It seems to me so now, as when the trial was had.     The detectives say the consideration for the release was the few paltry dollars doled out to him—not even five for the whole time—and his ticket to Memphis.     Common humanity demanded that much, and a real generous repentance for the wrong done this man, and a desire for reparation, coupled with common humanity, would have produced a far more liberal treatment; and one of the worst features of this case is the parsimony with which he was treated in that respect by his captors, who, with the same kind of pretense already described as to his "freedom" and "voluntary" actions, boast that he was "treated like a gentleman," and so "acknowledged" to them.     It is another circumstance to weigh against them on the issue of duress.

I need not cite the cases on the law of duress.     It is familiar to us all that they establish that he who sets up a contract under such circumstances must show that it was fairly and voluntarily obtained.

As to the law of directing a verdict, I concede that it is very easy for the court to usurp the functions of the jury in exercising that power; and here in Tennessee, where the power is unknown to the state courts, and not permitted under any circumstances, perhaps it is difficult to reconcile counsel to any exercise of it whatever.     But the rule is well understood to be that, if, fairly looking at the testimony, there can be no reasonable dispute about the facts, the court will direct a verdict where it would not at all sustain one to the contrary if rendered by the jury.     This means a dispute arising out of the proof, and a doubt about the facts, arising out of the credibility of witnesses, out of the conflicts of testimony, out of the variety of influences to be drawn from circumstances proven which are equivocal in their character, and out of a diversity of implications of fact from other facts.     In all such cases, no matter what the judge thinks, the issue should go to the jury to have all such doubts resolved by their verdict, and, no matter how slight the doubt, the court should not settle it, but leave it to that constitutional tribunal.     But the mere pleading

the denial of a plain fact, or testifying to opinions entertained as to the effect of that fact, or mere argument against its existence, does not of itself create a dispute to go to the jury. These witnesses deny that there was any duress. The plea denies it, and the argument as well, but the facts proven necessarily and inexorably show duress as a matter of fact and law. Such are the cases where a verdict should be directed. The plaintiff's proof, taken in connection with that already reviewed, makes that course more imperative.

The only remaining objection is that the court did not give effect to the recall of Anthony's authority by the defendant's telegram; but that cannot be a serious objection. It was not obeyed, and was, probably, never known to Anthony. Being informed, in reply to the telegram addressed to the agency at St. Louis recalling Anthony, that that functionary had located McCall, they were directed by the defendant company to go ahead, the only purpose of the recall being really to escape the suggestion of a "reward" by the railroad company for McCall. Being originally authorized by the defendant to arrest McCall, the detective agency, or Anthony, who had been detailed for the service of the defendant as a detective, and had been sent on that business, one or both, were, at the time of this arrest and in making it, acting within the scope of the defendant's employment, although acting wrongfully in disobedience of orders. I have just considered that subject in the admiralty case of *Hall* v. *Sims*, (*The General Rucker*,) in reference to the decisions of the supreme court of the United States. *The General Rucker, post*, 152.

Having engaged in an effort to increase the judgment by an accumulation of interest so as to get into the supreme court, the defendant is not in an attitude to include in the motion, as a ground for a new trial, the usual suggestion that the damages are excessive. The verdict is larger than I expected it would be, and larger than I would have given if upon the jury, but not so excessive as to justify a new trial. Upon that subject, and as a general support for the charge to the jury, I wish to quote the following extract from the case of *Huckle* v. *Money*, 2 Wils. 205, where there was a verdict of £300 in one case, and of £200 each in 15 other cases, against certain messengers of the king, who had arrested the plaintiffs arbitrarily:

"But the small injury done to the plaintiff, or the inconsiderableness of his station and rank in life, did not appear to the jury in that striking light in which the great point of law touching the liberty of the subject appeared to them at the trial. They saw a magistrate over all the king's subjects exercising arbitrary power, violating *magna charta*, and attempting to destroy the liberty of the kingdom by insisting upon the legality of this general warrant before them. They heard the king's counsel, and saw the solicitor of the treasury, endeavoring to support and maintain the legality of the warrant in a tyrannical and severe manner. These are the ideas which struck the jury at the trial, and I think they have done right to give exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish inquisition,—a law under which no Englishman would wish to live an hour; it was a most daring attack upon the liberty of the subject. I thought that the twenty-ninth chapter of *magna charta,—nullus liber homo capiatur vel imprisonetur*, etc., etc., *nec super eum*

*ibimus, nec super eum mittemus, nisi per legale judicium parium suorum vel per legem tenæ, etc.,*—which is pointed against arbitrary power, was violated. I cannot say what damages I should have given if I had been on the jury; but I directed and told them that they were not bound by any certain damages, against the solicitor general's argument. Upon the whole, I am of the opinion that the damages are not excessive, and that it is very dangerous for the judges to intermeddle in damages for tort, and which all mankind at first blush must think so, to induce a court to grant a new trial for excessive damages."

Here the jury saw a formidable organization of detectives for the pursuit of criminals, in the pay of private parties, and in their interests alone, employed by the defendant for that purpose, proceeding in the most arbitrary manner, without the least pretense of magisterial authority, to arrest a free man, and drag him to a distant place in another dominion, for a crime committed there, and in this case arresting the wrong man in that way, when regular procedure would have developed that fact, and prevented the outrage. This verdict and judgment do not go so much upon the negligence or blunder of arresting the wrong man as upon the illegality of the proceeding as against anybody. The fundamental error was in assuming that it was possible to arrest a fugitive from another state without a warrant, by merely having a policeman make the arrest, and then negotiating for "a consent," which should relieve the "service" of the trouble of extradition proceedings. If the necessity which relaxes the law against arbitrary arrests in favor of policemen proceeding to temporarily detain suspected persons can be thus extended, then, indeed, is the policeman greater than the king. The mere presence and co-operation of a policeman does not make "a police arrest" valid, but the circumstances, and particularly the exigencies, of the case must be such as to justify the policeman in proceeding without a warrant. However useful detective agencies may be, they proceed at their peril, and at that of their employers, when they undertake arbitrary arrests such as this is shown to have been. Motion overruled.